UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MERRILL HAVILAND, PILLIP C BAMMEL,
JOSEPH B. BIDWELL, EDWARD BIEGAS,
JANE BOGUE, GEORGE CEROVSKY,
JOHN H COREY, GEORGE C. CROMER,
DONALD L. CROSS, JAMES J. DAWSON,
JANE DOE, JOHN DOE, MARILYN J. GARROD,
LEROY L. HEBBEN, THEODORE R. HERTEG,
HAYES M. HOBOLITH, JACKIE L. HOSIER,
RICHARD H KABEL, NATHAN E. KOCH,
VERNON L. LANCASTER, JOHN A. LINDELL,
WILLIAM J. LUDDEN, EDWARD R. MANTEL,
M. DELORES MATTHEWS, GEORGE W. MCCLAIN,
WILLIAM I. OWENS, JOHN R. PETERSON,
RAYMOND E. PORTER, IRWIN B. REISMAN,
ROBERT W. REITH, ROBERT F. SALAY,
CHARLES P. SCHAEFER, ROBERT D. SCHEPPER,
ROBERT J. SCHMANDT, RICHARD SCHWALLER,
REX M. SHAMLEY, JOHN SMALE,
ROYCE L. SNIPES, CLIFFORD G. STUDAKER,
JOHN R. SWAN, OTTO VOSAHLIK,
EARL C. WALTERS, ELWOOD WATKINS,
EUGENE R. WEAVER, PAULINE S. WELLS,
MINNIE H. WORTHINGTON, AND
JOSEPH B. WRIGHT,

     Plaintiffs,

vs.                                                           Case No. 11-13176

METROPOLITAN LIFE INSURANCE COMPANY,

                                                     HON. AVERN COHN

     Defendant.

_____/

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (Doc. 21) AND DISMISSING CASE

## TABLE OF CONTENTS

I.      Introduction                                                                    1

II.     Background                                                                       2
        A.      The Plan and MetLife's Role                                             2
        B.      GM's Bankruptcy and the Cap on Life Insurance Benefits                  4
        C.      This Case                                                               6

III.    Motion to Dismiss                                                              7

IV.     Analysis                                                                        8
        A.      State Law Claims - Complete Preemption                                 8
        B.      State Law Claims - Express Preemption                                  10
        C.      State Law Claims -Failure to State a Claim                             11
                1.      Count VII - Statutory Conversion                               12
                2.      Count VIII - Unjust Enrichment                                 12
                3.      Count IX - Breach of Contract                                  13
                4.      Count X - Negligent Misrepresentation                          13
                5.      Count XI - Uniform Trade Practices Act                         14
        D.      ERISA Claims                                                           15
                1.      MetLife Did Not Reduce the Continuing Life
                        Insurance Benefit                                              16
                2.      MetLife's Notice Letters Cannot Create ERISA
                        Liability                                                      16
                3.      The Notice Letters Did Not Contain False
                        Statements                                                     21
                4.      MetLife Had No Duty to Disclose that Continuing
                        Life Insurance Benefits Were Subject to GM's
                        Periodic Payment of Premiums to MetLife                        22
                5.      ERISA Does not Authorize Compensatory or
                        Consequential Damages                                          24
                6.      Count III - ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)          24
                7.      Counts IV, V, and VI - ERISA § 502(a)(3),
                        29 U.S.C. §1132(a)(3)                                           24
                        a.      Count IV - Declaratory Judgment                        25
                        b.      Count V - Unjust Enrichment/Disgorgement               26
                        c.      Count VI - Constructive Trust                          27
                8.      Res Judicata/Collateral Estoppel                               28
        E.      Plaintiffs' Remaining Arguments                                        29

V.      Conclusion                                                                     32

i

## I.  Introduction

This case seeks "continuing life insurance benefits."  Plaintiffs are Merrill
Haviland and forty-two other individuals[1] who are past employees of General Motors
Corporation (GM) and participants in the Life and Disability Plan (Plan).  The Plan is
governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, <u>et seq</u>.
(ERISA).  Broadly stated, plaintiffs contend that the Plan guarantees them continuing
life insurance benefits when they retired from GM with ten (10) or more years of
participation in the Plan.  As will be explained, GM, as part of its 2009 reorganization,
amended the Plan to reduce the continuing life insurance benefit to $10,000.00 for each
retiree-plaintiff.

Plaintiffs have sued defendant Metropolitan Life Insurance Company (MetLife),
claiming that MetLife, the provider of a life insurance policy to the Plan, sent "notice
letters" to plaintiffs in the 1980s or 1990s in which they say MetLife guaranteed the "life
time" nature of the benefit to plaintiffs and its failure to honor that benefit is grounds for
suit.  The First Amended Complaint (FAC) purports to assert six claims under ERISA
(Counts I-VI) and five claims under state law (Counts VII-XI), phrased by plaintiffs as
follows:

| | | |
|---|---|---|
| Count I | Promissory Estoppel |
| Count II | Breach of the Terms of the Plan |
| Count III | Breach of Fiduciary Duty Pursuant to 29 U.S.C. § 1132(a)(1) |
| Count IV | Declaratory Judgment Pursuant to 29 U.S.C. § 1132(a)(3) |

---

[1]Plaintiffs also seek class certification; However, they have not moved to certify
as class.

Count V          Unjust Enrichment Pursuant to 29 U.S.C. § 1132(a)(3)

Count VI         Equitable Restitution Pursuant to 29 U.S.C. § 1132(a)(3)

Count VII        Conversion

Count VIII       Unjust Enrichment

Count IX         Breach of Contract

Count X          Negligent Misrepresentation

Count XI         Violation of the Michigan Consumer Protection Act

Plaintiffs seek damages, various forms of equitable relief, and demand a jury trial.

MetLife contends that the FAC should be dismissed because (1) plaintiffs' state law claims are in reality claims for ERISA plan benefits and therefore preempted, (2) the FAC fails to state any viable ERISA claim, (3) even if the state law claims are not preempted, they do not state viable claims for relief.  For the reasons that follow, the motion will be granted.

## II.  Background

### A.  The Plan and MetLife's Role

Many years ago, GM established the Plan, an ERISA-governed "welfare benefits" plan.  The Plan provided for, among other things, a life insurance benefit.  Specifically, a review of the various versions of the Plan, the summary plan descriptions (SPDs), and notice letters, which are in the record, display the following:

1.    GM is the employer and plan sponsor of the Plan.

2.    The Plan provided its salaried employees with certain benefits, including a "basic" or "continuing" life insurance benefit" (hereafter, "continuing life insurance benefit").  The continuing life insurance benefit provided employees with an amount of life insurance while

2

they were employed by GM.  After salaried employees retired, the continuing life insurance benefit automatically began to reduce by predetermined amounts until it reached a predetermined level.

3.      In order to provide the continuing life insurance benefit provided under the Plan, GM purchased for the Plan a group term life insurance policy from MetLife.  MetLife's obligation to pay claims for continuing life insurance benefits was conditioned on GM making periodic payments of group life insurance premiums.

4.      The Plan grants MetLife (named as "Carrier" in the Plan) with discretion to interpret the Plan and to determine eligibility and entitlement to Plan benefits.  The Plan does not give MetLife authority to change the Plan or the amount of the continuing life insurance benefits to which retirees are entitled.

5.      The Plan called for retirees to receive one or more notices concerning the automatic reductions in their continuing life insurance benefit.  Based on the the Plan, and at GM's direction, MetLife sent notices to GM's retirees in letter format dictated by GM.

6.      The notice letters describe the continuing life insurance benefits using plan terminology and plan terms/conditions ("Continuing Life Insurance after Age 65 for Retirees with 10 or More Years of Participation") and/or by direct reference to GM's life insurance programs ("Continuing Life Insurance Under the Provisions of the General Motors Life and Disability Benefits Program for Retirees with 10 or More Years of Participation"); ("Under the provisions of the General Motors Insurance Program…").   The letters, consistent with the language of the Plan as then in effect, stated that the amount of the continuing life insurance benefit identified in the letter would continue for the retiree's lifetime

7.      The Plan and the SPDs issued regarding the Plan reserve unto GM the sole right to change all welfare benefits provided to retirees at any time, including but not limited to the continuing life insurance benefit.  Examples of this language include the following:

        - "The Corporation, as the Program Administrator shall be responsible for the administration of the Program and reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time."

        - "General Motors Corporation reserves the right to amend, change or terminate the plans and programs described in this booklet."

3

- "General Motors Corporation reserves the right to amend, change, or terminate the Plans and Programs described in this booklet. The Plans and Programs can be amended only in writing by an appropriate committee or individual as expressly authorized by the Board of Directors. No other oral or written statements can change the terms of a benefit Plan or Program."

### B. GM's Bankruptcy and the Cap on Life Insurance Benefits

In late 2008, the United States Treasury Department loaned more than $13 billion to GM to prevent GM's financial collapse. The loan agreement started a joint effort by the White House, the Treasury Department, and GM to create a plan to save the automaker. Among the issues concerning the federal government which GM had to address was the level and associated costs of retiree benefits. After the White House and Treasury rejected GM's initial restructuring plan, the parties eventually developed a plan that they intended to be effectuated through the filing of a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. The plan called for a new company, new GM, to purchase with Treasury funds certain assets of the old GM. On June 1, 2009, GM filed for bankruptcy and moved in the bankruptcy court to approve a Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser. The same day, an attorney for the General Motors Retiree Association (the GMRA) entered his appearance. The GMRA requested that the bankruptcy court appoint an "official committee" under 11 U.S.C. § 1114(d) "to represent [] retirees, spouses and survivors regarding their protected benefits." The basis for this request was that the bankruptcy proceedings directly would impact, among other things, the life insurance benefits GM provided to its salaried retirees. GM and its affiliated debtors (the Debtors) objected to the GMRA's request, which was ultimately denied without prejudice.

4

The bankruptcy court approved the Amended and Restated Master Sale and Purchase Agreement (the MPA), which effectuated the sale and transition of assets from the Debtors to New GM.  This order overruled existing objections to the MPA and stated that "[t]he MPA, all transactions contemplated thereby, and all the terms and conditions thereof (subject to any modifications contained herein) are approved." Among the items the bankruptcy court approved was GM's reduction of the retirees' continuing life insurance benefits to $10,000.00  The MPA in relevant part states as follows:

> Purchaser's obligations to assume benefit plans and to maintain compensation and benefits for one year contemplate the aggregate reduction of the total benefit obligations under Assumed Plans related to Salaried Retiree Life Insurance . . . Executive Retiree Life Insurance and hourly (non-UAW) Life Insurance and Health Care plans by approximately two-thirds, as compared to the obligations of Parent as determined as of 12/31/08.

> The changes in salaried retiree benefits being implemented for achieving this are identified as follows:
> -       Retiree Basic Life Insurance for salaried classified and executive retirees reduced to $10,000 effective the first of the month following the Closing Date[.]

The bankruptcy court further held that "[t]his Order and the MPA shall be binding in all respects upon the Debtors, their affiliates, all known and unknown creditors of . . . any Debtor. . . ."  The order further provided that "[e]xcept for the Assumed Liabilities . . . the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers arising under or related to the Purchased Assets."  The bankruptcy court retained jurisdiction to enforce the terms the order and the MPA.

Various GM retirees filed individual objections and proofs of claim with respect to ERISA benefits - including life insurance coverage - to which the retirees believed they were entitled.  The bankruptcy court, however, sustained the Debtors' objections to the

retirees' proofs of claim and requests.  The bankruptcy court found that without approval

of the MPA (to which the retirees, among others, had objected), the retirees and other

interested parties "would receive nothing," explaining:

> GM cannot survive with its continuing losses and associated loss of liquidity, and
> without the governmental funding that will expire in a matter of days.  And there
> are no options to this sale . . . As nobody can seriously dispute, the only
> alternative to an immediate sale is liquidation - a disastrous result for GM's
> creditors, its employees, the suppliers who depend on GM for their own
> existence, and the communities in which GM operates.  In the event of a
> liquidation, creditors now trying to increase their incremental recoveries would
> get nothing.

In re General Motors Corp., 407 B.R. 463, 474, 481 (Bankr. S.D.N.Y. 2009).

Following GM's decision to lower the continuing life insurance benefit amounts to

$10,000, GM began paying a lower premium for the group term life insurance it

purchased from MetLife.

## C.  This Case

In July 2011, plaintiffs filed a complaint in state court, alleging only state law

claims.  MetLife removed the action to federal court on the grounds that it was

preempted by ERISA.  MetLife alternatively argued that federal jurisdiction existed

under the Class Action Fairness Act.  Plaintiffs did not move to remand.

On September 16, 2011, MetLife moved to dismiss the complaint.  (Doc. 7).  Plaintiffs

filed an opposition and sought leave to amend the complaint.  MetLife did not oppose

the motion to amend; the Court granted the motion.  Plaintiffs then filed the FAC on

December 14, 2011 (Doc. 20) which MetLife has moved to dismiss (Doc. 21).

## III.  Motion to Dismiss

6

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint.  To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.  In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Id. at 678 (internal quotation marks and citation omitted).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents referenced in the pleadings and central to plaintiff's claims, (2) matters of which a court may properly take notice, (3) public documents, and (4) letter decisions of government agencies may be appended to a motion to dismiss.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007).  Here, the Court has considered documents which are referenced in the FAC and central to plaintiffs' claims.

7

These include the Plan, various other Plan related documents, MetLife documents, and government documents related to GM's bankruptcy.

## IV.  Analysis

### A.  State Law Claims - Complete Preemption

MetLife first contends that the plaintiffs' state law claims are completely preempted by the "comprehensive civil enforcement scheme" in ERISA § 502(a), 29 U.S.C. § 1132(a).  See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987).  The Court agrees.  "This integrated enforcement mechanism . . . is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans."  Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004).  "Therefore, any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive[,] and is therefore preempted."  Id. at 209; see also Hutchison v. Fifth Third Bank, 469 F.3d 583, 588 (6th Cir. 2006) ("As in Davila, it does not matter whether plaintiffs cite a different body of law to support their cause of action (state tort or contract law []) or whether the relief that plaintiffs seek is different from the relief that ERISA affords (damages for personal injury or breach of contract versus plan benefits under ERISA).");  Smith v. Provident Bank, 170 F.3d 609, 613 (6th Cir. 1999) (holding that "it is the nature of the claim . . . that determines whether ERISA applies, not whether the [ERISA] claim will succeed").

While plaintiffs characterize their state law claims with various labels, what plaintiffs allege are claims for benefits and/or for clarification of plaintiffs' rights to benefits under the Plan.  In either circumstance, the claims fall squarely under 29

8

U.S.C. § 1132(a)(1)(B).

First, the FAC alleges as the state law claims, that the allegations supporting their ERISA claims are incorporated.  The ERISA claim allegations include (1) that the Plan is an ERISA which provides the continuing life insurance benefit, (2) that plaintiffs are former employees of GM who are eligible for the continuing life insurance benefits under the Plan and are "participants" in the Plan, (3) that MetLife provided the group life insurance policy funding the Plan, (4) that GM paid the premiums for the policy; and that MetLife as fiduciary determined eligibility for continuing life insurance benefits.

Additional allegations within the state law counts make clear that plaintiffs are attempting to secure ERISA-governed continuing life insurance benefits via state law.  See, e.g., FAC at ¶¶ 66, 99, 103, 106, 109, 110, 113.  These allegations bring this action within the parameters of ERISA.  Thus, plaintiffs' state law claims are completely preempted.

Plaintiffs, however, argues that their state law claims are not completely preempted "to the extent that Defendant MetLife is not found to have discretionary authority [i.e. a fiduciary] with respect to the management or administration of the Plan and/or any control over assets of the Plan."  FAC at ¶ 100, 107, 118.  This contention lacks merit.  Complete preemption under ERISA does not depend on whether MetLife is an ERISA fiduciary.  Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 64-65 (1987).  Rather, it turns on the status of plaintiffs as participants or beneficiaries under the Plan and the nature of the claims and relief sought by plaintiffs.  Plaintiffs cite no authority for the proposition that complete preemption should be determined according to a defendant's fiduciary status.  Overall, plaintiffs' state law claims are claims for benefits under an

9

ERISA plan.  They are subject to complete preemption.

## B.  State Law Claims - Express Preemption

MetLife also argues that plaintiffs' state law claims are expressly preempted by ERISA.  The Court agrees.  ERISA's express preemption provision, 29 U.S.C. § 1144(a), states in relevant part that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ."  This provision is "conspicuous for its breadth" and the "deliberately expansive" language Congress enacted.  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990) (citations omitted).  The Supreme Court has held that "[t]he key to § 514(a) is found in the words 'relate to.'  Congress used those words in their broad sense . . . '[a] law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.'"  Id. at 138-39 (citations omitted).

The Sixth Circuit has stated that it is "axiomatic" "that Congress intended ERISA to have the broadest possible preemptive effect."  Lion's Volunteer Blind Indus., Inc. v. Automated Group Admin., Inc., 195 F.3d 803, 807 (6th Cir. 1999); see also Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1276 (6th Cir. 1991) (holding that "virtually all state law claims relating to an employee benefit plan are preempted by ERISA").  Indeed, if a state law claim alters "employee benefit structures[,]" "provide[s] alternative enforcement mechanisms" or "bind[s] employers or plan administrators to particular choices" the claim is preempted.  Loffredo v. Daimler AG, No. 10-14181, No. 10-14214, 2011 WL 2262389 (E.D. Mich. June 6, 2011).

Again, regardless of the label, plaintiffs' state law claims relate to and ultimately seek continuing life insurance benefits that are governed by the Plan.  ERISA prevents

the use of such "alternative enforcement mechanisms" and courts have found similar

state law claims seeking ERISA benefits preempted.  See Cromwell, 944 F.2d at

1275-76 (breach of contract, negligent misrepresentation claims preempted); Nester v.

Allegiance Healthcare Corp., 315 F.3d 610, 613 (6th Cir. 2003) (contract claim

preempted); Lion's Volunteer, 195 F.3d at 809 (misrepresentation claim preempted);

Hardy v. Midland Enters., Inc., 66 Fed. Appx. 535, 539 (6th Cir. 2003) (claims for

compensatory damages, punitive damages, misrepresentation preempted); Zuniga v.

Blue Cross Blue Shield of Michigan, 52 F.3d 1395, 1401-02 (6th Cir. 1995) (breach of

contract based on interpretation of "the Chrysler and Ford employee benefit plans"

preempted); Briscoe v. Fine, 444 F.3d 478, 496-501 (6th Cir. 2006) (misrepresentation,

fraud, concealment and conversion preempted); Tassinare v. Am. Nat'l Ins. Co., 32 F.3d

220, 224-25 (6th Cir. 1994) (contract claims preempted); Caffey v. Unum Life Ins. Co.,

302 F.3d 576, 582 (6th Cir. 2002) (fraud and negligence claims preempted).  See also

Loffredo, supra (holding that plaintiffs,' retired executives of the Chrysler Corporation,

state law claims for promissory estoppel, breach of fiduciary duty, age discrimination,

silent fraud, and statutory conversion seeking damages as a result of Chrysler's

reductions of their retirement benefits were preempted)

## C. State Law Claims - Failure to State a Claim

MetLife alternatively argues that even if plaintiffs' state law claims are not

preempted, they fail to state a claim upon which relief may be granted.  Each claim is

discussed in turn.

## 1. Count VII - Statutory Conversion

11

Count VII alleges statutory conversion. "[T]o prevail on a claim for statutory conversion, [] a claimant must [] satisfy the elements of a common law conversion claim" in addition to an "actual knowledge" element. Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC, No. 07-13523, 2009 U.S. Dist. LEXIS 90393, at *66 (E.D. Mich. Sept. 30, 2009). Here, plaintiffs allege that MetLife "converted a portion of each the [sic] Plaintiffs' interests in the continuing life insurance benefits . . . by reducing the amount of continuing life insurance to a mere $10,000." FAC at ¶ 99.

This claim fails to state a plausible claim for relief. First, plaintiffs have no current claim to any life insurance or other payments. The life insurance benefits are term life insurance benefits with no cash, loan or paid up value and plaintiffs have not alleged that they entrusted any "specifically identifiable" funds to MetLife's care. See Live Nation Worldwide, Inc. v. Hillside Productions, Inc., No. 10-11395, 2011 U.S. Dist. LEXIS 34405, at *6-7 (E.D. Mich. Mar. 30, 2011) ("For a plaintiff to prevail on a claim of conversion for money, 'the defendant must have an obligation to return the specific money entrusted to his care.'") (citation omitted). At best, plaintiffs have alleged a right to make a future claim for term life insurance benefits. Second, even if one or more plaintiffs or their beneficiaries has already made or could make a claim for benefits, the conversion claim still fails. The '"failure to pay a debt, without more, does not amount to conversion of the unpaid funds.'" Id. at *7 (citation omitted).

## 2. Count VIII - Unjust Enrichment

Count VIII claiming unjust enrichment fails for the same reason that the ERISA based unjust enrichment/disgorgement theory fails, as will be explained below. In short, plaintiffs have not alleged that they conferred any benefit on MetLife; rather, they allege

GM made the premium payments.  See Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc., 212 Fed. Appx. 558, 564 (6th Cir. 2007) (stating that under Michigan law, unjust enrichment requires "receipt of a benefit by the defendant from the plaintiff") (emphasis added); Gold v. Cadence Innovation, LLC, 577 F. Supp. 2d 896, 901-03 (E.D. Mich. 2008) (dismissing unjust enrichment claim).

### 3.  Count IX - Breach of Contract

In Count IX, plaintiffs allege that MetLife breached "written contracts for life insurance benefits" with plaintiffs.  FAC at ¶ 109-10.  Plaintiffs have not alleged the basic elements a breach of contract claim.  To plead a breach of contract claim under Michigan law, a plaintiff must allege (1) the existence of a contract, (2) the terms of the contract, (3) breach of the contract by the defendant, and (4) that the breach caused the plaintiff's injury.  See Webster v. Edward D. Jones & Co., 197 F.3d 815, 819 (6th Cir. 1999).  Because Count IX contains only conclusory statements on these elements - plaintiffs cannot identify any purported contract other than the Plan - plaintiffs' breach of contract claim fails to state a plausible claim for relief.  See Battah v. ResMAE Mortg. Corp., 746 F. Supp. 2d 869, 876 (E.D. Mich. 2010) (dismissing contract claim containing only "conclusory allegations" and a "formulaic recitation of the elements of [the] claim").

### 4.  Count X - Negligent Misrepresentation

To state a claim for negligent misrepresentation, plaintiffs must allege that MetLife made a false misrepresentation, prepared without reasonable care, and which was justifiably relied upon by plaintiffs to their detriment.  See Evans v. Mercedes Benz Fin. Servs., No. 11-11450, 2011 U.S. Dist. LEXIS 79404, at *13 (E.D. Mich. July 21, 2011).

Here, plaintiffs have not plead any facts demonstrating that any statements in the notice letters they received was not true when made.  Moreover, an actionable misrepresentation must relate to past or existing facts, not future promises of performance.  See German Free State of Bavaria v. Toyobo Co., Ltd., 480 F. Supp. 2d 958, 965 (W.D. Mich. 2007).  The misrepresentations in this case, however, do not relate to such promises.  Plaintiffs rely exclusively on the prospective statement that "their life insurance benefits would remain in effect for the rest of their lives."  FAC at ¶113.  Finally, any reliance on the notice letters was unreasonable as a matter of law.  The GM plan documents expressly stated that the terms of the plan could be amended by GM at any time, which GM did in bankruptcy proceedings.  Overall, Count X fails to state a claim for relief

### 5.  Count XI - Uniform Trade Practice Act

MetLife says that Count XI fails for three reasons.  The Court agrees.  First, the twelve-percent interest penalty in the statute only applies if, among other things, a claim for insurance benefits is not paid within "60 days after satisfactory proof of loss was received by the insurer[.]"  M.C.L. § 500.2006(4); see also Acme Roll Forming Co. v. Home Ins. Co., 31 Fed. Appx. 866, 872 (6th Cir. 2002) (holding that whether interest is payable "hinges on whether and when Acme provided a 'satisfactory' proof of loss to Home Insurance").  The FAC does not allege that any plaintiff presently is entitled to the life insurance benefits sought, let alone that "satisfactory proof of loss" has been provided to MetLife.

Second, even if a plaintiff filed a claim for benefits, no plaintiff is entitled to any more than a $10,000 continuing life insurance benefit.  There is no underlying claim for

14

additional benefit amounts, and thus any claim for additional interest should be dismissed.  See, e.g., Mass. Mut. Life Ins. Co. v. Johnson, No. 08-14130, 2009 U.S. Dist. LEXIS 17254, at *14 (E.D. Mich. Mar. 6, 2009) (interest not recoverable where no claim for benefits exists).  Finally, Count XI must be dismissed to the extent plaintiffs seek numerous forms of damages and amounts that are not authorized by the interest provision of M.C.L.§ 500.2006(4).  See Burns v. Unum Group, No. 10-11957, 2010 U.S. Dist. LEXIS 132499, at *15-16 (E.D. Mich. Dec. 15, 2010).

### D.  ERISA Claims

The FAC also alleges six ERISA claims.  The first three counts, promissory estoppel (Count I), breach of the ERISA plan (Count II), and breach of fiduciary duty under ERISA § 502(a)(2) (Count III), are all based upon (1) the notice letters purportedly representing that the amount of plaintiffs' continuing life insurance benefits would continue for their lifetime, which plaintiffs characterize as a false promise because the benefits have now been reduced decades later, and (2) MetLife's alleged failure to disclose that the continuing life insurance benefits were conditioned upon GM's continued premium payments.  All of these counts seek compensatory and consequential damages.

The three remaining ERISA counts are brought under ERISA § 502(a)(3).  Count IV alleges that MetLife, in violation of state law, failed to give plaintiffs proper notice of an alleged "constructive termination"of the continuing life insurance benefits.  Plaintiffs seek a declaratory judgment that their pre-GM bankruptcy continuing life insurance benefit amounts remain in effect.  Count V alleges a claim for unjust enrichment on the theory that MetLife received premium payments sufficient to cover the pre-GM

15

bankruptcy continuing life insurance benefit amounts.  Although plaintiffs do not say that they paid these premiums, they nonetheless seek "disgorgement."  Count VI does not assert any separate grounds for liability under ERISA but instead simply seeks to impose a constructive trust or equitable lien on any funds received by MetLife as a result of the conduct described in other ERISA counts.  MetLife says all of these claims fail for several reasons.  The reasons are addressed in turn below.

### 1.  Metlife Did Not Reduce the Continuing Life Insurance Benefit

MetLife first says that it has no responsibility for the reduction in plaintiffs' continuing life insurance benefits.  MetLife is correct.  Under the Plan terms, GM had the sole and exclusive right to amend or modify Plan benefits, not MetLife.  The Court does not have to accept the FAC's allegation that <u>MetLife</u> reduced plaintiffs' benefits, FAC at ¶ 56, 58.  It is clear from GM's bankruptcy proceedings that GM, not MetLife, reduced plaintiffs' continuing life insurance benefit amounts.  MetLife cannot be responsible under ERISA (or otherwise) for administering the new terms of the GM plan.  While this finding alone could end the matter, MetLife offers additional reasons for why plaintiffs' ERISA claims fail.

### 2.  MetLife's Notice Letters Cannot Create ERISA Liability

In 1998, the Court of Appeals for the Sixth Circuit, sitting <u>en banc</u>, examined GM's Plan language and held that under ERISA, GM had the right to change "lifetime" welfare benefits.  <u>Sprague v. GM</u>, 133 F.3d 388 (6th Cir. 1988).  In <u>Sprague</u>, a purported class of retired GM employees sued to recover allegedly "fully 'paid-up' lifetime health care benefits."  133 F.3d at 392.  As part of reductions in its salaried work force, "GM made numerous oral and written representations about the health care benefits

16

available to early retirees." Id. at 395.  Similar to the allegations by plaintiffs here, "[t]he main thrust of the plaintiffs' complaint was that [through these oral and written representations] GM had bound itself to provide salaried retirees and their spouses basic health coverage for life, entirely at GM's expense." Id.

The Sixth Circuit rejected plaintiffs' claim.  The court of appeals observed that-like here-it was dealing with an employee welfare benefit plan and not a pension plan.  The difference was significant because unlike a pension plan, welfare benefit plans are exempt from ERISA's vesting requirements.  Id. at 400.  It held that while an employer may contractually agree to vest welfare plan benefits, such a commitment "is not to be inferred lightly," and that "the intent to vest 'must be found in the plan documents and must be stated in clear and express language.'" Id.

Therefore, the Sixth Circuit concluded that the writings promising GM's early retirees certain health care benefits were not plan documents and were subject to GM's right-repeatedly and unequivocally reserved in the Plan-to amend or terminate benefits in the plan documents.  Id. at 393-94, 400-403.  Accordingly, the retirees had no basis to insist that GM continue to provide the amount of healthcare benefits they say they were promised for their lifetime.  Id.

Plaintiffs advance the same theory rejected in Sprague – that individualized letters identifying benefit amounts for the retirees' lifetimes can trump contemporaneous ERISA plan language reserving unto the plan sponsor the right to terminate or modify plan benefits.  Subsequent Sixth Circuit decisions have followed Sprague and rejected purported ERISA claims based on non-plan documents such as correspondence, summaries or benefit worksheets.  Crosby v. Rohm & Haas Co., 480 F.3d 423, 428-30

17

(6th Cir. 2007) (requiring formal amendments of plans in accordance with plan procedures); Hardy, 66 Fed. Appx. at 538-39 (following Sprague and affirming dismissal of ERISA claim based on letters received by retiree on health care benefits).  Plaintiffs' claims against MetLife are based solely on one-page letters to plaintiffs stating that certain amounts of life insurance under the GM plan "will remain in effect for the rest of your life," fall within the class of ERISA claims that the Sixth Circuit rejected based on Sprague and its progeny.

Attempting to distinguish Sprague, plaintiffs contend that they are proceeding on a theory of promissory estoppel which is permitted under Sprague.  In Sprague, the Sixth Circuit held that such a claim requires (1) conduct or language amounting to a misrepresentation of material fact, (2) that the party to be estopped is aware of the true facts, (3) an intention that the misrepresentation will be relied upon, (4) that the party asserting estoppel is unaware of the true facts, and (5) actual justifiable reliance on the misrepresentation to the detriment of the party asserting estoppel.  Sprague, 133 F.3d at 403.  However, the Sixth Circuit narrowly limited the circumstances in which a promissory estoppel theory can be invoked:  "Principles of estoppel…cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions."  Id. at 404.  Importantly, the Sixth Circuit rejected the promissory estoppel claim because the plan unambiguously reserved unto GM the right to amend the plan terms.

Plaintiffs' promissory estoppel ERISA claim suffers the same fate.  Plaintiffs have not alleged the Plan terms are ambiguous, a threshold prerequisite to any promissory estoppel claim.  This alone is fatal.  See Marks v. Newcourt Credit Group, Inc., 342 F.3d

18

444 (6th Cir. 2003) (dismissing estoppel claim at pleadings stage where plan was unambiguous).

Plaintiffs also cite Bloemker v. Laborers' Local 265 Pension Fund, 605 F.3d 436 (6th Cir. 2010), to support an ERISA promissory estoppel claim. In Bloemker, the panel majority stated that "[w]e have [] allowed enforcement of something other than the plan documents based on estoppel under appropriate circumstances." Id. (emphasis added). However, the allegations in the FAC do not qualify as appropriate circumstances, which the Bloemker panel described as "(1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." Id. The panel allowed the promissory estoppel claim to proceed because plaintiff received letters identifying the amount of plaintiff's monthly pension benefits and because "it would have been impossible for him to determine his correct pension benefit given the complexity of the actuarial calculations and his lack of knowledge about the relevant actuarial assumptions." 605 F.3d at 443.

Here, by contrast, plaintiffs allege that the "misstatement" upon which they relied was "that the amount of Plaintiffs' continuing life insurance benefits would not be reduced for the rest of their lives[.]" FAC at ¶ 67. Plaintiffs did not need to engage in complex actuarial calculations. All plaintiffs needed to do was examine the Plan or SPDs, both of which unambiguously reserved to GM the right to amend or cancel benefits at any time. Thus, Bloemakr is distinguishable.

To the contrary, plaintiffs here knew, or should have known, from the unambiguous language of the Plan documents that GM could reduce or eliminate their

continuing life insurance benefits at any time.  Bloemker cannot save plaintiffs' estoppel claim.

Plaintiffs' reliance on Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571 (6th Cir. 2006) is similarly misplaced.  In Yolton, the Sixth Circuit affirmed a preliminary injunction in the plaintiffs' favor on grounds that their health insurance benefits had "vested," because under the plaintiffs' collective bargaining agreement their "pension plan is a lifetime plan and [their] health insurance benefits are tied to the pension plan[.]" Id. at 580.  The defendants' SPDs in Yolton also contained inconsistent language with respect to the power to terminate benefits.  Id. at 583.

Here, by contract, plaintiffs have not alleged that either of these circumstances are present in this case, nor could they: the GM Plan does not contain any language evidencing an intent to vest life insurance benefits, and, to the contrary, repeatedly and expressly reserves GM's right to amend the Plan.  Thus, Yolton does not apply.  See also Schreiber v. Philips Display Components Co., 692 F. Supp. 2d 747, 759-61 (E.D. Mich. 2010) (distinguishing Yolton because the SPDs did not evidence an intent to vest retiree health insurance benefits).

Similarly, the Second Circuit's decision in Devlin v. Empire Blue Cross Blue Shield, 274 F.3d 76 (2d Cir. 2001), which plaintiffs also cite, does not support their theory.  In Devlin, the employer's various SPDs contained conflicting statements concerning whether "Empire [the employer] would or could later reduce or eliminate" the life insurance benefits, which discrepancies the Second Circuit found created genuine issues of material fact regarding whether the plaintiffs' benefits vested.  Id. at 79-80, 85. Here, the GM Plan documents contained no such inconsistencies and instead expressly

reserved the right to amend benefits.  See Griffiths v. Ohio Farmers Ins. Co., No.

09-1011, 2009 WL 3817592, at *12 (N.D. Ohio Nov. 13, 2009) (distinguishing Devlin

and recognizing that Second Circuit's standard for benefit vesting is more lenient than

the Sixth Circuit standard).  Overall, the Plan governs plaintiffs' claim for continuing life

insurance benefits, not correspondence from MetLife.[2]

### 3.  The Notice Letters Did Not Contain False Statements

MetLife also says that plaintiffs' ERISA claims should be dismissed because the

FAC contains no assertions that any statements in the notice letters were untrue at the

time they were made.  See, e.g., Wilson v. Sw. Bell Tel. Co., 55 F.3d 399, 405 (8th Cir.

1995) (affirming dismissal of ERISA claim where "[n]othing in the record before this

court reveals that the representations made to employees about potential future plans

were false at the time made").  The Court agrees.  The only representation that plaintiffs

say is false is that benefit amounts "will remain in effect for the rest of your life."

However, that statement was true when made-prior to GM's bankruptcy.  At the time,

the Plan entitled plaintiffs to receive the benefit amounts identified in the notice letters

for their lifetimes.  Plaintiffs' theory that MetLife should have predicted that decades

later GM would suffer financially and be forced to substantially reduce welfare benefits

for its retirees and/or the premiums it was able to pay for those benefits simply cannot

---

[2]Although not alleged by plaintiffs, it is unlikely that the notice letters create liability under § 1132(a)(1)(B) in light of the Supreme Court's decision in CIGNA Corporation v. Amara, 131 S.Ct. 1866, 1878 (2011), where the Supreme Court stated that "the summary documents, important as they are, provide communication with beneficiaries about the plan, but [ ] their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)."  While the notice letters here are not SPDs, they are statements which communicated information to Plan beneficiaries regarding their benefits.  Under Amara, such statements do not form a claim for relief under § 1132 (a)(1)(B).

support a claim for relief against MetLife.

### 4. MetLife Had No Duty to Disclose that the Continuing Life Insurance Benefits Were Subject to GM's Periodic Payment of Premiums to MetLife

MetLife further contends that Counts I, II and III fail to the extent they are based on the assertion that MetLife "failed to disclose to Plaintiffs that the amount of their continuing life insurance benefits could be reduced in the event that GM failed to make the required premium payments to MetLife and/or that maintaining the amount of each Plaintiffs' continuing life insurance benefits was conditional upon GM's continued payment of premiums to MetLife." FAC at ¶ 68; see also id. at ¶¶ 77, 82-83. The Court agrees. Such a claim is foreclosed by Sprague and the Plan disclosures. Sprague made clear that welfare benefits do not vest, i.e. they are conditional. Plaintiffs' allegations require this Court to draw the implausible inference that salaried GM employees and retirees did not realize that one must pay premiums to secure insurance coverage.

Furthermore, there is nothing in ERISA's detailed reporting and disclosure requirements that require the disclosure obligation plaintiffs seek to impose on MetLife, i.e., that a group life insurance policy that funds a welfare benefits plan is conditioned upon continued premium payments by the employer. Rather, ERISA imposes on the plan administrator or employer-here, GM in both cases-the obligation to provide certain notices and disclosures, including but not limited to, a "summary plan description" and an "annual report" concerning the ERISA plan. 29 U.S.C. §§ 1021-1025. ERISA mandates different disclosures depending on whether one is dealing with a pension plan or a welfare benefits plan. ERISA requires disclosure when an employer is going to miss a payment funding a pension plan, but not when it is going to miss a payment

22

funding a welfare benefit plan:

> If an employer maintaining a plan …fails to make a required installment or other payment required to meet the minimum funding standard under section 1082 of this title [which deals with minimum funding requirements for pension plans] to a plan …the employer shall notify each participant and beneficiary …of such plan of such failure.

29 U.S.C. § 1021(d); see also 29 U.S.C. §§ 1021-1024.  The absence of a similar requirement for welfare benefit plans forecloses the disclosure plaintiffs demand from MetLife.

Moreover, plaintiffs cannot invoke ERISA fiduciary duties to enhance ERISA's disclosure requirements.  As the Sixth Circuit observed, "[i]t would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed." Sprague, 133 F.3d at 405; see also id. at 406 (stating that "[w]e are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed").  "[T]he Sixth Circuit has never held that ERISA imposes a general duty of disclosure on fiduciaries." Shirk v. Fifth Third Bancorp, No. 05-49, 2009 U.S. Dist. LEXIS 24490, at *54 (S.D. Ohio Jan. 29, 2009).  ERISA does not obligate a fiduciary to disclose to plan participants that benefits may be reduced or cease if the subject plan's sponsor and administrator (or, as here, the plaintiffs' former employer) fails to pay for such coverage.

Finally, any disclosure claim under ERISA fails because plaintiffs have not alleged that GM's obligation to make premium payments was material. See Kerber v. Qwest Group Life Ins. Plan, 647 F.3d 950, 971 (10th Cir. 2011) ("We fail to see how misrepresentations regarding Qwest's ability to decrease life insurance coverage would

23

affect a reasonable employee's retirement decisions, where Qwest admittedly retains the right to terminate life insurance coverage.) (emphasis omitted) (affirming dismissal of claims based on employer's reduction of retiree life insurance benefits to $10,000). Plaintiffs do not allege that they would have taken, or not taken, any action had MetLife disclosed that GM's non-payment of premiums could affect MetLife's coverage of their life insurance benefits.  Thus, the omitted information cannot be said to be material.

### 5.  ERISA Does Not Authorize Compensatory or Consequential Damages

As noted above, plaintiffs seek compensatory and consequential damages from MetLife in Counts I-III.  These types of damages are not available under ERISA.  See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985); Helfrich v. PNC Bank, Kentucky, Inc., 267 F.3d 477, 481-83 (6th Cir. 2001); Hoeberling v. Nolan, 49 F. Supp. 2d 575, 580-81 (E.D. Mich. 1999).

### 6.  Count III - ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

In Count III, plaintiffs make a breach of fiduciary duty claim against MetLife under 29 U.S.C. § 1132(a)(2).  This claim fails because a claim under ERISA Section 502(a)(2) only may be asserted on behalf of the plan.  See Loren v. Blue Cross Blue Shield of Michigan, 505 F.3d 598, 608 (6th Cir. 2007); Weiner v. Klais and Co., Inc., 108 F.3d 86, 91-92 (6th Cir. 1997).  Plaintiffs allege they are seeking recovery on their own, not on behalf of the Plan.  Count III must therefore be dismissed.

### 7.  Counts IV, V and VI - ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

MetLife says that because plaintiffs' equitable based ERISA claims actually constitute claims for plan benefits and/or seek clarification of the right to benefits which fall under ERISA § 502(a)(1)(B), any claims under ERISA Section 502(a)(3) are

24

duplicative and do not constitute "appropriate equitable relief." The Court agrees. See Varity Corp. v. Howe, 516 U.S. 489, 515 (1996) ("we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury [as it does in §502(a)(1)(B)], there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."); Marks v. Newcourt Credit Group, 342 F.3d 444, 454 (6th Cir. 2003); Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 615-16 (6th Cir. 1998). Counts IV, V and VI must be dismissed, as explained below.

### a. Count IV - Declaratory Judgment

In Count IV, plaintiffs "seek a declaration that Defendant MetLife cannot reduce the amount of Plaintiffs' continuing life insurance benefits below the amount that Defendant MetLife represented would not be reduced for the rest of Plaintiffs' lives" because of a Michigan statute that regulates notice of the "termination of insurance coverage." FAC at p.13 and ¶ 86 (citing M.C.L. § 500.4012(b)). This claim is subject to dismissal for three reasons. First, this claim is both completely and expressly preempted by ERISA. Although labeled an ERISA claim, the entire basis for the claim is a Michigan state law, thus creating an impermissible "alternative enforcement mechanism" with respect to plan benefits. Second, ERISA § 502(a)(3) does not apply here. A plaintiff cannot seek a declaration under ERISA that certain alleged actions violate state law because the plaintiff is not seeking "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan" or "(B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this title or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3)(A)-(B). Third, the Michigan statute addresses only terminations of coverage. No such "termination" of

insurance coverage occurred here.  Indeed, plaintiffs still are entitled to $10,000 and

MetLife continues to provide a group term life insurance policy to GM to fund the

benefits payable under the Plan.  Plaintiffs' "constructive termination" (FAC at ¶ 87)

theory fails because the statute addresses only "terminations" and there are no cases

addressing this statute have recognized constructive termination.

Plaintiffs have not shown how the text of § 1132(a)(3) permits enforcement of a

state law.  Plaintiffs have cited no Michigan law supporting their strained reading of

M.C.L.§ 500.4012(b) which would essentially expand the statute's applicability to court

approved reductions in insurance coverage.  They instead rely only on the bare

assertion that MetLif''s faithful reading of the statute's express terms limiting its

application to terminations of coverage somehow elevates form over substance.  This is

not persuasive.  Third, plaintiffs fail to explain how this statute even applies to group life

insurance benefits, such as those at issue, given its location in a chapter dealing only

with individual life insurance policies.  Compare M.C.L. § 500.4000-4073 ("Life

Insurance Policies and Annuity Contracts (Other than Industrial or Group)") with M.C.L.

§ 500.4400-4454 ("Group Life Insurance") (emphasis added).

### b. Count V - Unjust Enrichment/Disgorgement

Count V alleges unjust enrichment/disgorgement under § 502(a)(3).  This claim

must also be dismissed.  Plaintiffs' request for disgorgement is based on a contradictory

and implausible factual allegation.  Plaintiffs allege in Count V that all premiums were

paid in full while alleging elsewhere that GM needed to continue making premium

payments in order for them to receive their benefits.  FAC at ¶ 68, 77, 82-83, 91-92.

"Although alternative legal theories may be plead, contradictory factual allegations may

26

not." Wylie v. City of New Haven, No. 02-313, 2003 U.S. Dist. LEXIS 25273, at *2 n.1

(D. Conn. Feb. 27, 2003) (emphasis added); see also Roller v. Litton Loan Servicing,

No. 10-13847, 2011 U.S. Dist. LEXIS 65827, at *14-16 (E.D. Mich. June 21, 2011)

(plaintiffs' failed to state "plausible" claim under Twombly standard where their

complaint "alleges materially contradictory facts").

Moreover, plaintiffs demand that MetLife "disgorge" the premiums while

conceding that GM -and not plaintiffs-made all the payments.  It is clear that plaintiffs

cannot demand return of monies they never paid.  Finally, plaintiffs offer no plausible

explanation why a financially-troubled GM would need to reduce retirees' term life

insurance benefits to save premium expense if GM already had long-since paid the

premiums for those benefits in full.  Overall, this claim must be dismissed.

### c. Count VI - Constructive Trust

Count VI does not raise any new theory of ERISA liability.  Rather, it seeks a

remedy for other alleged ERISA violations.  Plaintiffs allege that they "are entitled to a

constructive trust and/or equitable lien on any funds received by Defendant MetLife in

the course of or as a result of Defendant MetLife's false promises and representations

and/or fiduciary breaches or knowing participation in such breaches."  FAC at ¶ 95.

Because plaintiffs have no viable ERISA claims as described above, Count VI must be

dismissed.

Count VI also fails because plaintiffs have not alleged an entitlement to an

equitable lien or constructive trust under § 1132(a)(3), and instead demands legal

damages remedy.  In Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213

(2002), the Supreme Court held that restitution is available under § 1132(a)(3) as a form

27

of "appropriate equitable relief" "in the form of a constructive trust or an equitable lien" only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."

Here, plaintiffs do not allege any facts concerning the "identifiable" fund, "traceability" or "possession" requirements. They instead demand "any funds" allegedly received, which is a claim for damages. These failures are fatal, because "[p]laintiffs seeking equitable restitution have the burden of establishing that the funds they seek are traceable and readily identifiable." Alexander v. Bosch Auto. Sys., Inc., 232 Fed. Appx. 491, 501 (6th Cir. 2007) (vacating district court order under Section 502(a)(3)).

Plaintiffs' equitable based claims ignore the undisputed facts that (1) plaintiffs' alleged harm is a reduction in continuing life insurance benefits, (2) GM periodically paid premiums to MetLife to fund plaintiffs' term insurance coverage, and (3) the bankruptcy court approved GM's reduction to plaintiffs' benefits. No plausible, "equitable" basis exists to indiscriminately disgorge, place a lien upon, or otherwise order the restitution of funds MetLife received over time from GM that are unrelated to plaintiffs' purported harm. Count VI must be dismissed.

### 8. Res Judicata/Collateral Estoppel

Finally, MetLife argues that any ERISA claim is barred by res judicata and/or collateral estoppel. "The normal rules of res judicata and collateral estoppel apply to the decisions of the bankruptcy courts." Katchen v. Landy, 382 U.S. 323, 334 (1966); see also FDIC v. Shearson-American Express, Inc., 996 F.2d 493, 498 (1st Cir. 1993) ("Orders, judgments and decrees of the bankruptcy court from which an appeal is not taken are final . . . even if erroneous."). Plaintiffs, who participated directly or indirectly

28

in the bankruptcy proceedings, may not launch a collateral attack on the bankruptcy court's approval of the MPA - including GM's life insurance benefit reductions - by filing this action against MetLife.  Thus, plaintiffs' ERISA claims are subject to dismissal on this ground as well.

### E.  Plaintiffs' Remaining Arguments

To preserve their misrepresentation-based ERISA claims, plaintiffs argue that "[o]nce a plan participant retires, the plan cannot be changed in a manner that adversely effects the retired participant's rights."  According to plaintiffs, this rule renders GM's power to reduce their life insurance benefits ineffective because "not a single version of the Plan ever explicitly reserved the right for GM to terminate or amend the Plan after the employees' performance was complete."  This argument fails.

First, the Sprague plaintiffs, like plaintiffs here, were retirees; and the Sixth Circuit nonetheless found GM was free to amend their welfare benefits in light of plan language giving GM that right.  Plaintiffs, however, cite decisions concerning top hat pension plans, which are not the same as a welfare plan.  See Kemmerer v. ICI Americas Inc., 70 F.3d 281 (3d Cir. 1995); Carr v. First Nationwide Bank, 816 F. Supp. 1476 (N.D. Cal. 1993).  A "top hat" plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[.]"  29 U.S.C. § 1051(2).  Top hat plans are unique forms of pension plans that are treated very differently from welfare plans.  Kemmerer, 70 F.3d at 286, 288; Carr, 816 F. Supp. at 1486, 1491; Bakri v. Venture Mfg. Co., 473 F.3d 677, 678 (6th Cir. 2007).  Unlike welfare benefit plans, top hat plans are susceptible to being characterized as "unilateral

29

contracts," by which a participant logically might argue that completing his performance (i.e., employment) vests his top hat benefits, absent a reservation of amendment rights in the plan.  See id.

Moreover, even if these cases did apply, they are distinguishable on the additional ground that in both cases the employers (unlike GM) failed to properly reserve their right to amend the "vested" top hat benefits.  Kemmerer, 70 F.3d at 287 ("the district court correctly concluded that after the [plaintiffs'] rights had vested when they completed performance, ICI could not terminate the plan in the absence of a specific provision in the plan authorizing it to do so.") and 289 (same); Carr, 816 F. Supp. at 1489-91 and 1493-94 (finding top hat payout schedules were detailed and explicit, and termination and modification provisions were inconsistent).  In short, plaintiffs' reliance on "top hat" plan case law is misguided.

Plaintiffs argue that their estoppel and misrepresentation claims under ERISA are viable by saying that "MetLife, as a fiduciary under the Plan, owes Plaintiffs an independent duty to accurately represent the scope of benefits available under the Plan."  Plaintiffs point to plan language and contend the letters at issue in this case constitute "advice" to plaintiffs.  This argument is misguided.

The first element of a breach of fiduciary duty claim based on an alleged misrepresentation or omission is "that the defendant was acting in a fiduciary capacity when it made the challenged misrepresentation" or omission.  Del Rio v. Toledo Edison Co., 130 Fed. Appx. 746, 751 (6th Cir. 2005).  "[A] person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions" under ERISA.  Hamilton v. Carell, 243 F.3d 992, 998 (6th Cir.

30

2001).  Accordingly, courts must examine each individual function of an ERISA defendant to determine if it is acting as a fiduciary.  See Pegram v. Herdrich, 530 U.S. 211, 226 (2000); Varity Corp. v. Howe, 516 U.S. 489, 498-505 (1996).

Examining MetLife's functions reveals it did not act as a fiduciary in sending form notices to plaintiffs.  Here, plaintiffs point to plan language that MetLife had discretionary authority with respect to determining benefit eligibility.  See FAC at ¶ 74-77.  However, they are do not cite to any plan language (or any other evidence) demonstrating that MetLife had any discretion to determine the content of communications concerning plan benefits, because no such language exists.  The fact that MetLife had no discretionary authority when communicating with plaintiffs is further demonstrated by the fact that GM, in its role as the Plan's sponsor, formal administrator and named fiduciary, dictated the format and contents of plaintiffs' letters to MetLife.  As detailed in Exhibit A to MetLife's reply brief, GM determined in 1977 that "each retiree age 65 or over who has either reducing or fully-reduced Continuing Life Insurance[] will be notified of the fully reduced amount of Continuing Life Insurance."  Id. at 1.  These "retiree notices would be mechanically generated by Metropolitan Life Insurance Company and forwarded to the appropriate units for verification prior to release."  Id.  GM created "[t]hree retiree notice forms" for use by MetLife, and in these notices GM created the language on which plaintiffs now rely for their claims: "This fully reduced amount of your Continuing Life Insurance remains in effect, without cost to you, for the rest of your life."  Thus, it cannot be plausibly said that MetLife acted as a "fiduciary" under ERISA by sending informational letters to GM Plan participants, which it "mechanically generated" based on a template provided by GM.

31

11-13176 Haviland, et al v. Metropolitan Life Ins. Co.
Memorandum and Order

Moreover, as explained above, even if MetLife was a fiduciary, "fiduciary duties" cannot be used to expand ERISA's specific and detailed disclosure requirements.  No additional disclosures about premium payments are required.  The letters accurately stated that plaintiffs no longer needed to make contributions; and they never even addressed - let alone misrepresented - whether GM needed to do so (i.e., make premium payments).  Plaintiffs' argument that they "could not possibly have known" that their benefits were conditional upon GM's continued payment of premiums lacks merit given the repeated disclosures in the GM Plan documents that this benefit was term insurance without a paid up cash or loan value.  Plaintiffs cannot rely on their own alleged interpretations of the notice letters given the Plan's unambiguous language to the contrary.

### V.  Conclusion

Despite a myriad of assertions and a variety of causes of action, plaintiffs have not stated a plausible claim for relief, no matter how they have characterized their claims.  The simple facts are:  (1) GM had a right to modify the Plan as it related to life insurance benefits; (2) GM modified the Plan as part of its bankruptcy; (3) MetLife had nothing to do with the modification; (4) MetLife's role in sending notice letters to plaintiffs is of no consequence to GM's right to do what it did.

Accordingly, for the reasons stated above, MetLife's motion to dismiss is GRANTED.  This case is DISMISSED.

SO ORDERED.

Dated:  June 26, 2012                    _S/Avern Cohn_____
                                         AVERN COHN
                                         UNITED STATES DISTRICT JUDGE

11-13176 Haviland, et al v. Metropolitan Life Ins. Co.
Memorandum and Order

Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, June 26, 2012, by electronic and/or ordinary mail.

S/Tanya Bankston on behalf of s/Julie Owens
Case Manager, (313) 234-5160